410-0984. For the appellate, Mr. Hoekstra, for the appellate, Ms. Duffy, Mr. Arbogast, you may proceed. Good afternoon, Your Honors. I'm John Hoekstra. I'm here for Mr. Crozier, appellant. To the extent that there is a room for argument here on what a trial court is to consider on the issue of custody, I wanted to address that just briefly. The comments in the opposing brief here are to the effect that, in our argument before this court, that we were only simply quantifying the evidence here as it pertains to Section 602, rather than considering the qualitative nature of the evidence. And we submit here that, by virtue of the legislature here requiring trial courts to consider specific enumerated factors, that by necessity there is an element here of a quantitative analysis in terms of the ten factors that the trial court is to consider. Certainly the quality of the evidence as it pertains to these factors is important and it cannot be reasonably said that a proper analysis of evidence in a custody case would not be to simply look at the factors and decide which of these factors should fall in favor of one party or the other and then make a ruling accordingly. In other words, if a court were to specifically say, and sometimes the trial courts do this, the ten factors I find, four of the factors favor one party, two of the factors favor the other, the others are neutral, therefore I find in favor of the party that these factors favor. I don't believe that that would be an improper analysis for a trial court to make in determining a custody issue. But certainly the quality of the evidence as it pertains to these factors is important as well. So I want to discuss both of those aspects of Section 602. We believe that it is true that the court in this case ruled that of the ten factors stated in Section 602, six of these factors either were not applicable or were neutral to both parties. In other words, that the evidence really did not favor one party or the other. However, that leaves us with four factors here that we believe the court should have considered properly, if I want to use that expression, in light of the evidence. The first factor is set forth in Section 602.3 and it deals with the interaction of the child with the parents and significant others. Now in this case the facts and almost all the facts here are not disputed, which is rather unusual in a custody case. But it's undisputed certainly here that the mother in this case had issues with her family. There might be some dispute as far as the closest of her relationship with her mother, but we know to a certainty she had no relationship with her father, that being the paternal grandfather, and of course the paternal grandfather had no relationship with this child, Nevaeh. We know that in terms of the mother's relationship with the child, and in this case it's very important the evidence that we have bearing on her relationship and interaction with the child, we know that there was solid evidence here of frequent and repeated failings on mother's part directly pertaining to her ability and willingness to care for this child. I want to highlight a witness here, Deanna Burgess, who was actually called by the mother in this case. Ms. Burgess admits that she's a longtime friend of the mother here, and in fact at the time of her testimony she remained friends with her. During her testimony, which was lengthy, there are not just general statements about, well, I think she's a good mother, or I think she should have custody. No, we have very specific testimony about numerous and repeated problems with this mother to direct her attention to the care of this child, or otherwise simply fail to do basic caretaking responsibilities that any responsible mother would do, any responsible mother that is exercising proper judgment would do. I'm not going to go through all those, but suffice to say we have multiple specific testimony relating to specific events on the part of the mother here that adversely impact on her ability to properly care for this child. Counsel, when the trial court made its decision in this case, the court stated it did not believe either party was a good parent, and it was forced to pick the better of the bad choices. Is the court correct? Well, obviously we don't believe the court was correct in awarding custody to the mother, but in terms of the statement... Are you talking about its assessment that it did not believe either party was a good parent, that it was forced to pick the better of the bad choices? We disagree with that statement. The reason being... So your client was just peachy keen, right out of Norman Rockwell? I'm not saying that. I guess we can discuss what the term a good parent means, but my response to that would be, and the court made the statement obviously, well, we have to look behind that statement and take a look at why the court made that statement. How about based on the evidence that was heard that established that neither party was a good parent? Well, again, that's where we have a dispute from our perspective as to the accuracy of the court's statement that the father was a bad parent. Was he squeaky clean? No, he was not. And that can be seen from the evidence. But what the court relied upon, as far as we can tell in the evidence, was basically two factors or two issues. One, he labeled Mr. Crocher as a multiple sex offender. And two, the court made the statement that he had not disassociated himself with this National Socialist Party. Kind of once a Nazi, always a Nazi. I guess that would be a way to... That was bad by the judge to make that call? Our response to that is a couple of things. First of all, the testimony, and again it was undisputed here, that Mr. Crocher's involvement with this organization dated back well before the child was born. He testified clearly that he had not had any involvement, was not associating with any members of that party, and simply had not had involvement. Now, is it the prerogative of the court, and I pointed out in my response brief, to reach the conclusion in his mind that you just mentioned? I suppose it is. But the evidence, we suggest, did not support that. We did not have evidence brought forth from Mother showing that he was involved, that he was still seeing or interacting with people. So, look, we're dealing with young parents on both sides. I would submit that, given this was well before the time when the child was born, he was very young, that it would be less likely, given all the evidence we have here, the entire record, that his comments to the court or his testimony would not be truthful. In other words, it would be easier to conclude if he was older and had been a member of this party his entire life, and all of a sudden, we're talking about a three-year period of time. Well, three years ago, I disassociated myself with this party. Well, that's a different statement if you're 50 years old, and I can understand a certain amount of skepticism. In this case, though, there's no question that we have, at that time, a very young person, and I think that under these circumstances, it's less likely that he does still have those leanings. I think the word leanings was the word that the trial court used. As far as the other reason for the court's statement, that I think both these parties are not good parents or bad parents, whatever the actual statement was. The only other factor or issue that he cited was this whole question about whether he's a multiple-sex offender. Now, we can't discount that, of course. Is that important? Certainly. It's a specific factor that the court has to consider. Now, neither of these parties were convicted of crimes that would require registration, but the legislature doesn't say it has to be a registered sex offender, so certainly the court can and should consider that evidence. But the issue we have, and this is where we think the court was mistaken in its finding, was multiple-sex offenders. We just simply think that the court made a mistake in labeling Mr. Crozier's relationship with the mother in this case as constituting a sexual offense. It was not. The ages of these parties are such that under any of the statutes that we're dealing with, he was not a sex offender under those statutes. We think he was mistaken. We think that he thought that it was, and when he said multiple-sex offender, I believe he was referring to this incident with Mr. Crozier's step- much younger, 18, and this incident with the mother. So it's just not the case. The facts are not disputed as far as what the parties' ages were. So is it important? Can the court consider the situation with the stepsisters? Certainly. But again, we're weighing the evidence here. What we have on the flip side, on Mother's standpoint, is a clear violation of the sex offense statute. Not only much more closely approximate in time than his custody decision, but after Mr. Crozier files his paternity petition and after she already knows that he's seeking custody in this case, what does she do? She has a relationship with a 16-year-old, and not only does she have a sexual relationship with him, and she does at that time commit a crime by doing so, not only that, but she becomes impregnated with this 16-year-old as a result of that. So we have both of these parties are sex offenders. So what should the trial court have placed greater weight on? We suggest that the greater weight should have been placed on an offense that occurred after she's already had one child in her care, and when she knows that this is a situation involving a contested custody case. It gets back to a recurring theme in this case, where we just see over and over Mother's failure to exercise a reasonable judgment or responsibility. Certainly the decisions that she made as a person are going to have consequences insofar as the child is concerned and her ability to properly parent. So is my point here that the ninth factor involving the sex offender, is my point that the court should have favored Mr. Crozier on this point? No. My point or argument here is that this should have been a neutral finding. Well, what did you want the trial court to do? Have the Department of Children and Parents Services come in and take over? Insofar as the mother's failure? As far as the child. No. Again, it was our position and remains that Mr. Crozier is a perfectly... is perfectly suited for the custody of this child. Give me his record, you can say that? Yes. Yes. And again, I'll keep coming back to what we said. The only negatives that the court refers to are what we've just discussed here. We do not have negative testimony from the mother. For instance, we don't have any testimony from Mother that when the father has visitation with this child that she comes home dirty, that he can't feed her properly, that he can't clothe her, he can't bathe her. We have none of that testimony. Instead, again, her only negative comments during her case was referring to the National Socialist Party and some comments about instances where he had said he had a relationship with a younger female. Oh, and then the trial court should have overlooked the fact that he apparently had sexual relations with his stepsister? Not overlooked, no. Not at all. We have four factors here that we think are applicable. The ninth factor involving the question about whether either parent is a sex offender should have, at the worst, in terms of Mr. Kosheir, been a neutral factor. It can be argued, I'm not making the argument, but it could be argued, though, that given the proximity in time and the situation involving a pending custody case, that Mother's offense could have been given greater weight than the offense of Mr. Kosheir. But I'm not making that argument. What I'm suggesting to the court here is that the other three factors, that is, factor three involving interaction with the parent and other people, the adjustment to the home, which involves a significant question of stability, and the physical health of the parties involved, including smoking, using illegal substances, that those factors, those three factors, in our view, based on this record, should have strongly come down in favor of Mr. Kosheir. So it gets back to what I was alluding to at the outset. We have ten factors, three of which are in play, if you want to call it that, the ninth being, at best or worst, neutral. So we look at these three factors, and when we consider all of the evidence, and I talked about the testimony from Ms. Burgess, who was not, if she was biased, she was biased in favor of Mother. I don't understand your point. Doesn't it end up being disclosed that she had a sexual relationship with the child's father, and that she's angry at the mother at the time that she's interviewed, to decide whether she's going to testify? I mean, if I'm a trial judge, I'm going to factor that into whether there's any bias, and the value that I give the testimony. Well, insofar as the initial comment here, was she angry with the mother at the time she made the initial comments? And those were made to myself, by the way, as you can see from the record. What we have here to, we think, eliminate that argument is Mother herself, which would have been redirect examination, asking this witness, Ms. Burgess, well, isn't it true we were fighting, you were mad at me, therefore, isn't it also true, then, that the statements you made are false? She says specifically, no. She denies, she says that what she told, the testimony that she rendered during my cross-examination was accurate. There's no question about that. So Mom was doing what she could here to try to get this witness to say that she was being untruthful, and this witness did not go along with what Mother was trying to do here. Well, did Ms. Burgess, on cross-examination, say that the custody order be given to the mother? She did. And, you know, again, it's our position she was, in fact, biased. She's been a lifetime friend of the mother. So in terms of that statement, I think it can be discounted. But I also made the comment that what we had during her testimony was very specific testimony concerning events and situations and what this mother was doing. That's very specific testimony. And then she just makes a general statement in response to, I think, a leading question from Mother. Do you still think that Jacob should have custody? I think she says no. So we have a very, very just general statement versus very specific testimony that she specifically, when given the opportunity to recant or deny, she declines to do so. So we believe that that testimony is far more truthful and credible than a statement at trial where she says, well, no, I no longer think that. She is, after all, biased. So we're talking about the testimony of this witness who we think is significant, which, by the way, the trial court doesn't mention in its finding anywhere. So we think that is certainly a significant testimony. We have the evidence of her instability, where she even admits that she's in an unstable situation. I think in my brief I said she had moved nine times since the birth of the child. I think I counted it up again. I came up with nine moves just in the short period of time between the child's birth in August of 2010 and, I'm sorry, August of 2009 and November of 2010. What was the testimony with respect to his exercise of his visitation rights? The testimony in that regard was that he'd been exercising his visitation. There was a temporary order in place, and the parties had actually completed mediation and had done some revisions to that. The court in its findings stated that they both had done pretty well. I think that's a direct quote in terms of their attitudes towards the other party in terms of fostering a relationship. So there was not a violation. I'm sorry. We'll hear from you in rebuttal. May it please the court, counsel. My name is Sarah Duffy. I'm here today with my co-counsel, Mr. Robert Arbogast, on behalf of the appellee. As Mr. Arbogast and I prepared the appellate brief and for today's oral argument, I think what we found was the unique perspective we were faced with. We were not involved in the trial court proceedings. Our involvement in this case came with this appeal. So as part of that, we're reviewing a cold record as we get ready to determine how we're going to argue the case. And what I found interesting in doing that is the importance of the deference that must be given to the trial court. The credibility arguments that are made at the trial court level, the facial reactions, the body movements, those types of things that a record can't disclose to the appellate court in its decision. And I found that very telling and very important in this particular case. Those intangibles that you can't get on the cold record, I think, are what led Judge Travers to the decision that he made. He specifically said in his decision that he had to read between the lines. It's a direct quote from his decision. And I think that's important. I think at the end of the day, credibility was a huge issue. I'm not sure if he found many of them credible at all, to be honest, in making his decision. Justice McCullough mused about the involvement of DCFS. I guess that would be curtain C option in this case. What about that? Well, I believe that DCFS has been involved in this case. I believe there was some testimony as to that, that there was a DCFS call or investigation, and it was unfounded at the particular point in time that DCFS was called in. The decision is, was Judge Travers' decision against the manifest way to the evidence? Was his decision unreasonable? Was it arbitrary? Was there no evidence to support what he decided? Well, it seems regrettable that if the judge is correct, it appears to be that neither of these parties would be a good parent or is a good parent. He's required to choose between, or maybe the best way to put it is the lesser of the two evils. I'll agree. And actually, the next point that I plan to bring to the Court's attention is just that fact. I think he's right. My client's here today, and I'll say it in front of her. I do think that this is a choice that Judge Travers had to make, where he picked which is the better of two bad choices. I think we have two young individuals who have a lot of growing up to do, and unfortunately, we're put in the place of being parents at a young age. They both need to grow up. They both need to figure out what's important and put the child first. And I hope that that happens.  In looking at the factors, he did a nice job in his decision of going through each of them. I don't think that he specifically found factor one in favor of mom, factor two in favor of dad. I think the approach that he took, and I think in this particular case was a reasonable one, kind of go through, make his comments about each of those factors, place in his mind the weight on those factors that's appropriate, and then announce his decision, which is what he did. The factors are not inclusive. It says all relevant factors, including the ten that are enumerated in the statute. And I think that he did a nice job of considering all of those. We don't have a scorecard here. Mom gets six, dad gets four, mom gets custody. That's not how it works, and I think Judge Travers did a nice job of that. Are there more in terms of number against mother? Potentially. But the two that Judge Travers focused on for father, which I think are important ones, are his interaction and sexual relationships with younger individuals, one being his stepsister for which he was convicted of a battery as a result of that incident, and the other being a member of the National Socialist Organization. He also admits in his testimony that I believe police records would indicate he had a gang affiliation. I'm assuming that all stems from his interaction and relationship with the National Socialist Organization. In the briefs, I think the big issues were the stability of my client. Beginning in August of 2010, she started living with her grandparents. She continues there today. So I think the stability issue has fallen by the wayside, and Judge Travers had the opportunity to see that in two of the hearings he had, because two of those were after the time in which she moved in with her grandparents. In addition, there was question about her illegal drug use. Judge Travers consistently tested both individuals throughout the proceedings. They passed all of the drug tests. And I think that's a good sign in this particular case. That would be July through November? Something like that? Was it the first hearing? I believe that, yes, July of 2010, yes. And then that drug testing was occurring before the hearing started. I believe there were, I'm going to misspeak, but I believe there may have been two prior to that time. And the parties passed those drug tests. One of them being a hair follicle test, which I think if you're going to try to fake a drug test, you're going to have difficulty on that particular test doing it. And I think that's important, because there were many questions about her drug use, but there was very little evidence that there was actual drug use. And I think the drug tests support the idea that she had begun to clean up her act and will continue to do that. Does your review of the record show that your client called Ms. Burgess as a witness? No. Or that Mr. Hoekstra called her as a witness? That's correct. I believe what had happened is the first, I want to say the first date that Mr. Hoekstra had rested or the second date, and then they came back and they allowed Ms. Burgess to testify before my client continued with her case at that time. So Ms. Burgess was a petitioner witness. And what I found, and I would just comment briefly on her testimony, when you look at her answers, the questions given to her are long. Her answers are yes, no. I don't think there's a lot you can glean out of yes, no answers. And at the end of the day, she did side with my client and say, yes, I believe custody should be with her. Whether or not she's biased against one side or the other I think would probably depend on the day. Her situation is a precarious one. She's friends with my client, but she's sleeping with Mr. Crozier. I don't know where someone like that falls, and I think Judge Travers probably dismissed a great deal of what he heard from her in making his decision. And so in viewing all the evidence before the court, the statutory factors that have to be considered, and the credibility, which I think is the huge piece of this, the credibility of the parties, we believe that Judge Travers made the right decision, that his decision was not against the manifest weight of the evidence, and we would ask the justices today to affirm his decision. Thank you. Let me apologize. I completely got that wrong. I indeed did call Ms. Burgess. This was a long trial. It was at the very end of the trial. I'm sorry I did not attempt to mislead the court here. But I, in fact, did call Ms. Burgess as a witness. Question about the DCFS thing. I could be wrong. I'll defer to counsel on this point. I do not recall evidence that there was prior DCFS involvement. I could be wrong about that. I think a witness made reference to calling DCFS and saying, you ought to take a look at this because of not caring for the child, something like that. I don't have an independent recollection of what the circumstances, but we do know, though, that, in fact, DCFS was not involved in this case. Nobody has requested that to be done. So, you know, is this a case where we throw up our hands and say, boy, these people are just both bad parents, and neither one of them should have the child, and we just have the child go into foster care. Again, we just simply do not believe the evidence supports that, really from either parent's perspective. I don't know, Lou, if this is the determinative fact, but it is one that everybody is certainly thinking about. As I understand the evidence that the trial court heard, he would have heard that when your client was 20, I guess, that's when he had a relationship with the child's mother, approximately, and she was 17. He was 21. 21. And at that time in Illinois, would that have been an offense? No. 17 was the age of consent as long as he wasn't a teacher or whatever. And if you look at those statutes, they are a little confusing. They can be. That's not a defense if the activity occurred. But at any rate, 21, 17, he makes reference to his stepsister being underage. I take it we're supposed to think from that that that would have been an offense. And it became an offense because of the batter. For purposes of our argument here, we can concede that, even though the evidence really wasn't clear. It was battery. That's what he was charged with. Right. But he admits to intimate relations with an underage stepsister. Not so much. He admits to a battery. But, again, for purposes of our argument, we can concede that. Then what are we to make of him? I guess he later explains that he's just trying to make somebody jealous, but he says, when I'm 21, I was intimate with this 16-year-old girl. That's a different instance. Right. And our response to that portion of the testimony is that he explicitly and unequivocally denied having relationships with a 16-year-old. This was a question brought out by him. But he admitted that he said that. This is something I told somebody. He did admit that. Correct. To either make them jealous and make them angry or whatever one's reason would be for admitting to this relationship or to a purported relationship. So the response to the issue of testing, by the way, the testing was done in August. That's when the judge ordered the hair follicle and urine testing in August of 2010. There was almost a month delay between the time we went to court and the judge ordered the testing, and mother and father, for that matter, actually showed up to do the testing. So there was a significant delay there. Mother had the hair follicle testing done first, and then later did the urine test. She showed up for her hair follicle test August 13, the court order was entered August 2. The urine test was not done until August 24. So there was a delay there. And, of course, the earliest testing that was done here was August of 2010. Was any testing repeated in September, October, or November? The court repeated the urine testing right before he issued his ruling at the conclusion of the hearing in November. And those tests were both negative. I want to point out that, though, the delays in the testing here. Counsel makes a comment that, as we look at this witness, Burgess, who is she biased? Well, certainly there was testimony that he had, Mr. Krosher, had relations with her, but, again, long ago, it was before this child was born. So I guess what's significant to us is a couple of things. Can you draw this to a quick close? Yes. Thank you. The negative testimony we have, insofar as Mr. Krosher is concerned, is well before this child was even born. And we also have, in the record, the court's specific comments twice as to the fact that mother was not represented by an attorney at the trial. He goes out of his way to point out this twice. And it's hard not to reach the conclusion when you see these comments that the court was speculating as to the existence of evidence negative to Mr. Krosher that simply wasn't brought out at trial. Thank you, counsel. We'll take the matter under advice. Thank you.